**SENTENCING MEMORANDUM ON BEHALF OF CHOUDARY VIRK**

Docket No. 24 Cr. 227 (MKB)

The Honorable Margo K. Brodie

Sentence Date: June 25, 2026

Filed: June 4, 2026

## <u>LIST OF EXHIBITS</u>

Medical Records, South Brooklyn Health …………………………………………………………Exhibit 1

**<u>INTRODUCTION</u>**

This memorandum and attached exhibit are respectfully submitted for the Court's consideration prior to imposing sentence on Choudary Virk. Mr. Virk is before this Court to be sentenced upon his conviction of single count of 18 U.S.C. § 1951 (a), Hobbs Act Robbery, pursuant to a plea agreement.

Mr. Virk's full-blown opioid addiction was the primary motivating factor of his criminal conduct. He had no prior criminal background, and acted alone. Notably, his demands for money from livery drivers were proceeded by demands to be driven to where he planned to meet his drug dealer, so he could immediately buy oxycodone. Mr. Virk has admitted responsibility for his actions, and is truly remorseful for the harm that he caused.

Through this pre-sentence submission, we respectfully request that this Court exercise the greatest possible degree of mercy and leniency, and sentence Mr. Virk to time served. We believe that this sentence is in keeping with the needs of justice, and addresses the individualized sentencing factors in the instant case.

Mr. Virk was arrested by NYPD March 14, 2023 and held at Rikers Island until January 9, 2024 (302 days), before being released with charges pending in New York State court. He was taken into Federal custody on this case on June 15, 2024, pursuant to a warrant, upon re-entering the country after a trip to visit his ailing father in Pakistan. As of June 25, 2026, he has spent an additional 750 days in Federal custody, mostly at the MDC, for a total of 35 months and 2 days. As a non-citizen, we anticipate that he will be immediately detained by ICE upon his release, held for an indeterminate amount of time, and then deported to Pakistan.

In light of the root causes of his offense, the impact of his offense, and the length of his incarceration to date, we therefore respectfully request that this Court sentence Mr. Virk to time served.

## SENTENCING SCHEME

The federal sentencing scheme is well known to the Court. It provides, in a nutshell, that (i) the sentencing guidelines "are truly advisory" and are not to be presumed reasonable (United States v. Dorvee, 616 F.3d 174, 182-3 (2d Cir. 2010)); (ii) the sentence imposed must "fit the offender and not merely the crime" (Pepper v. United States, 562 U.S. 476, 487-88 (2011)); (iii) the Court must conduct its own "independent review of the § 3553(a) sentencing factors" (United States v. Dorvee, 616 F.3d at 182)); and (iv) the Court must impose the shortest sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of criminal sentencing (United States v. Douglas, 713 F.3d 694, 700 (2d Cir. 2013)).

Furthermore, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988).  Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.

## PERSONAL HISTORY OF CHOUDARY VIRK

### *A Difficult Start*

Mr. Virk was born in Gujurnwala, Pakistan, in 2003, the fifth child of his parents. PSR ¶¶ 61, 62. His father, Jawad Mahmad, owned and operated a small farm; he was educated and his family life was stable. PSR ¶ 63.

In 2015, Mr. Virk's life changed overnight when he and his family emigrated to Brooklyn and moved into his paternal uncle's basement. Id. Shortly after, his father moved back to Pakistan, leaving his wife and their three sons to make the best of their lives in the United States. Id. Mr. Virk was twelve years old.

Life in Brooklyn was bleak. Instead of going to school, and benefiting from the social and emotional adjustment it would have provided, for the next three years young Mr. Virk was forced to worked at Hot Bagel, a deli owned by his uncle's son, alongside his two older brothers. PSR ¶¶ 87, 64. While he was paid $12 per hour, he was expected to give all of the money to his uncle.  He was not permitted to leave the residence without his uncle's permission. PSR ¶ 67. At the same time, his uncle's wife and children could come and go as they pleased. Id.  His mother was expected to cook and feed the her children on second floor of the building, where access for Mr. Virk and his siblings was restricted to 5:30 or 6:00 p.m. for dinner. PSR ¶ 65. Food was not permitted in the basement where they lived. Id. As a result, Mr. Virk frequently went to sleep hungry.

On multiple occasions, Mr. Virk was falsely accused by his aunt and her daughter of stealing money from his uncle, and was subsequently beaten; his uncle also beat Mr. Virk's mother, using a hard slipper from Pakistan, causing visible injuries. PSR ¶ 66. In another inci-

3

dent, Mr. Virk's brother Choudary Atif made the mistake of buying him a pair of Air Jordan sneakers. PSR ¶ 67. When his uncle found out, he beat Choudary Atif and burned the sneakers. Id.  Choudary Atif confirmed their uncle's cruelty to Probation; he "would torture them and tell them they weren't good and can't do things." PSR ¶ 68. Mr. Virk was powerless to stop him.

Mr. Virk, as he told Probation, didn't know what to do or how to cope with his situation; as he reported, he "hated his life and hated his uncle." PSR ¶ 77. Hopeless, confused, and alienated, he considered suicide. But knowing his religion would forbid it, he instead cut himself on his arm, leaving multiple scars that are still visible. Id. They are a permanent reminder of the self-hatred and sense of worthlessness that colored his formative years.

During this period, young Mr. Virk's mother raised her son's lack access to school with his uncle's wife. But the result was merely conflict between the two women - nothing changed. PSR ¶ 64. Finally, in 2018 Choudary Atif confronted their uncle and insisted that Mr. Virk start high school. PSR ¶ 68.

Mr. Virk thus enrolled at South Shore High School, but struggled with English. Three years out of school had heavily impacted both his ability to fit in and to perform. His teachers were concerned and contacted the family; per his brother Choudary Atif, they reported that he showed signs of stress and difficulty concentrating. PSR ¶ 68. In 2020, Mr. Virk dropped out of school to work, with his longest job (six months) at a Burger King in Brooklyn. After an argument with the manager, who was withholding his pay, he quit. PSR ¶ 86.

### *Drug addiction*

Soon after he began attending school Mr. Virk started using drugs, which were readily available and offered by his peers. At first, he smoked marijuana - daily - in an effort to cope

with the stress and unhappiness of his life at home. PSR ¶ 78. Needless to say, nothing changed; but Mr. Virk did confide in a friend about his issues with his uncle. Id.

Mr. Virk's friend introduced him to Percocet when he was around 17 or 18 years old. Id. Very quickly, he went from taking three to ten 30 mg pills per day. Id. Mr. Virk was initially given the pills from friends and other peers. Id. But when his source left the U.S., he was forced to try and purchase what he could. Id. Initially, he was able to get some money from his brothers, who didn't know what it was for, to buy what he needed. Id.

Mr. Virk was tormented, physically and emotionally, by his addiction. As he told Probation, when he couldn't get drugs - or money to purchase drugs - the pain drove him to robbery. Id. In the throes of withdrawal, he would "cry and ask God why [he] could not have a normal life like other kids and how [he] lived in Pakistan." Id.

### *Overdoses*

Mr. Virk does not remember precisely when, but he first overdosed in the company of other addicts in Bay Ridge, Brooklyn. The second occasion was on February 19, 2023. Mr. Virk was discovered by his brother Choudary Atif in his bedroom, unresponsive, with blue lips and "something coming out of his mouth," and was rushed to South Brooklyn Hospital in Coney Island. PSR ¶¶ 68, 80; Exhibit 1 (Medical record), P. 46-51. He was revived with an emergency dose of narcan. Id. He was 19 years old.

### *The offense conduct*

Nothing about Mr. Virk's conduct was particularly well planned; his criminal conduct is most simply and accurately understood as a self-destructive addict's repeated, desperate, ill-advised efforts to get money to relieve the pain of withdrawal. As substantially detailed by Proba-

tion, Mr. Virk's robberies all occurred near the time of his overdose - on February 17, February 20 (the day after the overdose), and twice on February 25, 2023. On each occasion, he called a cab from his personal cell phone, and after arriving at his destination, demanded cash from the driver at knifepoint. PSR ¶¶ 8-12.

Mr. Virk's first robbery on February 25 was a failure, because the driver fought back by hitting him with a bottle. After being struck in the head, Mr. Virk stabbed the driver in the arm and behind the right shoulder. After fleeing the scene, within a matter of hours he tried again - and succeeded in stealing $60 from his next and final victim.[1] It bears noting that he took nothing else of value - neither jewelry, wallet, nor credit cards. This was an act of immediate desperation, to gain money for drugs.

### A missed court date

On March 14, 2023, Mr. Virk was arrested at home by the NYPD and charged by the Kings County District Attorney's office. PSR ¶ 55. He made an inculpatory statement soon after his arrest, admitting the charged conduct, explaining his drug addiction, and requesting medical help. Unable to afford bail, he was held at Rikers Island pending trial. While at Rikers, in September 2023 he enrolled in the KEEP Program for opioid treatment.

On January 9, 2024, Mr. Virk released from Rikers after ten months and returned to live with his family. As noted in the Probation report, he was arrested for DWI on January 27, 2024 when police found him in his parked car with an open container. PSR ¶ 58. Although the case was ultimately dismissed, Mr. Virk spent the night in jail after his arrest.

---

[1] On this occasion, Mr. Virk also took the driver's dashboard-mounted video camera, out of an ill-conceived effort to destroy evidence of his identity.

At that time his father was in very poor health, and was living in Pakistan. On February 8, 2024, Mr. Virk flew to Pakistan to see him and assist in his care. As a result, he missed his King County court date for the robbery charges. On February 26, 2024, the Kings County Criminal Court subsequently issued an arrest warrant. PSR ¶ 56.

Mr. Virk flew with his father on or around March 8, 2024 to Toronto, Canada, to visit an uncle for about one week, then returned to Pakistan. On June 15, 2004 he boarded a plane back to New York, where he was expecting to address his Kings County case. However, he was arrested at the Dallas airport pursuant to a Federal arrest warrant. He was held at FTC Oklahoma, where he spent approximately one week before being flown to New York. He has been housed at the MDC since that time.

### *Conduct during detention*

During his detention at the MDC, Mr. Virk has incurred a series of infractions, as listed by Probation. PSR ¶ 71. This Court is urged to recognize these incidents as typical of the conditions encountered at the MDC, which were exacerbated by friction between Mr. Virk, corrections staff, and other incarcerated individuals.

Upon his arrival in July 2024, Mr. Virk was housed in a unit that had a broken light. Mr. Virk complained to staff, who in turn blamed him, twice, for breaking the light (in September and November 2024), which he did not do.

Mr. Virk was written up on March 1, 2025 for allegedly threatening bodily harm and being insolent; on this occasion, which was during Ramadan, he lost his composure when he was denied his single daily meal until hours after his expected mealtime.

7

On February 3, 2025, Mr. Virk was attacked after his former bunkmate was released without satisfying a financial debt to a gang-affiliated incarcerated individual. He was sent to the SHU for 20 days, and then returned to the same unit (Unit 43) where his assailant was housed. Mr. Virk refused to be returned there and was charged with Refusing to Obey an Order, in the process remaining in the SHU and losing approximately 200 days of phone privileges.

Mr. Virk was returned to Unit 43, and in October 2025, was caught smoking K2 and lost 50 days of commissary privileges. In December 2025, an incarcerated individual entered his cell and attacked him, accusing him of taking his stolen food (Mr. Virk had not done so). He was returned to the SHU.

Most recently, in February 2026, he lost 90 days of commissary privileges when he refused to return to Unit 61 out of fear, again, of gang violence.

Over the last two years, Mr. Virk has gotten clean, but has had intermittent relapses, in part because of the wide availability of controlled substances at the MDC. As of this writing, it is a pleasure to report that he is substance-abuse free, which he attributes to his Muslim faith and deep reflection while incarcerated. He is grateful for his sobriety and is looking forward (not without regret) to resuming his life in Pakistan. He reasonably expects to be much less challenged to stay sober back home, where he will be able to live with family, assist in his father's health care, and find meaningful employment.

8

## PRE-SENTENCE REPORT AND ADVISORY GUIDELINE CALCULATIONS

The Pre-Sentence Report ("PSR") accurately states that on September 10, 2025, Choudary Virk pled guilty before this Court to a single instance of 18 U.S.C. § 1951 (a), Hobbs Act Robbery, (Count 3 of the indictment), pursuant to a plea agreement.

In addition to pleading guilty, Mr. Virk stipulated to three other substantially similar offenses, occurring on February 7, February 20, and February 25, 2023. PSR ¶¶ 1-7. On each occasion, Mr. Virk called a cab, directed the driver to his destination, and demanded money at knifepoint. And one occasion - after the driver responded by striking him with a bottle - Mr. Virk stabbed the driver's arm and shoulder, requiring the driver's hospitalization. PSR ¶ 11.

The parties have stipulated that for the instant offense, as well as the stipulated conduct, the Base Offense Level (§ 2B3.1(a)) under the guidelines is 20; and that a four-point enhancement for the use of a Dangerous Weapon applies.

The parties are in dispute over whether an additional three or four points apply as a result of the injury Mr. Virk caused. However, they have agreed this single issue would not prevent a sentence predicated upon the plea.

Finally, the additional three robberies, as part of the Multiple Count Analysis, amount to an additional four points under § 3D1.4, bringing the maximum agreed-upon adjusted Offense Level to 32. Due to Mr. Virk's acceptance of responsibility, timely plea and Criminal History category of I, the agreed upon adjusted offense level is at most 29 (and is 28, if the Court agrees with the defense). PSR ¶ 3. The parties have also stipulated to the entry of a restitution order. PSR ¶ 2.

***Points Calculated for Injury to the Victim Should be Three Points, Not Four***

A "bodily injury" enhancement occurring from the use of a weapon during a robbery yields a two-level increase, while a "serious bodily injury" enhancement carries a four-level increase. U.S.S.G. § 2B3.1(b)(3).

The guidelines define "bodily injury" as "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1, comment (n.1(B)). "Serious bodily injury," on the other hand, involve "extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty" or "requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1, comment (n.1(L)).

Leading bodily injury cases include U.S. v. Jackson,  918 F.3d 467 (6th Cir. 2019) (victim pistol-whipped causing knot on head and brief loss of consciousness); U.S. v. Dortch, 628 F.3d 923 (7th Cir. 210)(cut to hand requiring 16 stitches). Compare U.S. v. Johnson-Dix, 54 F.3d 1295 (7th Cir. 1997) (gunshot wound that fractured victim's fibula was serious bodily injury).

Courts have found injuries that are significant, painful, and require invasive medical treatment - but not "serious" - worthy of a three-level increase. See, e.g.., U.S. v. Eubanks, CA.7, (Ill) 2010, 593 F.3d 645 (applying three points for an injury from a pistol-whipping that caused the victim to come close to losing consciousness and required four surgical staples to close).

Here, the victim sustained two wounds on his right arm, 1 centimeter and 2 centimeters long, and one on his back that was 1.5 centimeters long. He reported pain of 8/10. He was given six sutures on his shoulder; treatment at the hospital lasted only a few hours. The Government

10

has offered no evidence that his stab wounds, as bad as they were, were permanently disfiguring, impairing, or required physical rehabilitation.

This case, in sum, is like <u>Eubanks</u>: the violence, pain caused, and medical intervention are substantially similar. We accept that it is not a 2-point worthy case like <u>Jackson</u> or <u>Dortch</u> (16 stitches), but submit that is less grave than a 4-point worthy case akin to <u>Johnson-Dix</u> (fracture from gunshot).

We thus respectfully urge this Court to apply three instead of four points to the guidelines level for Count 3 - yielding an adjusted total level of 28.

## **SENTENCING CONSIDERATIONS UNDER 18 U.S.C § 3553(a)**

Taking into account the factors enumerated in 18 U.S.C. § 3553(a), we respectfully suggest that a sentence of time served is appropriate in this case. As this Court knows, the statute instructs that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" as outlined below. We respectfully suggest that the balance of all these factors weigh in favor of a sentence of time served.

### *Nature of the Offense, History and Characteristics of the Defendant, and Need for Deterrence*

Probation has agreed that his addiction and abuse history "may be considered as mitigating for sentencing purposes" by this Court. PSR ¶ 109. We thus respectfully urge the Court to weigh Mr. Virk's addiction, age, and the circumstances of his life as important mitigating factors.

Mr. Virk's status as an addict ties the nature of his offense to his own personal battles. There is no denying the violent and serious nature of his conduct, nor the need for both

11

specific and general deterrence. Yet at the time of his offense, Mr. Virk was a young man in need of treatment, with a history of trauma, self-harming behavior, and educational neglect that led to a serious, physical substance dependency. He did not rob out of greed, but because he knew of no other way to get cash for drugs. His lack of a criminal record or other documented history of violence reflects the truth that Mr. Virk is not, nor was, a person with an inherently violent disposition. The time he has served has sent a message, to him and society at large. We do not expect him to offend again.

As of this submission, Mr. Virk has served approximately 35 months, including his time at Rikers Island. Pursuant to §5G1.3(b) and (c), where a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction, the sentence for the instant offense "may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." U.S.S.C. Guidelines §5G1.3 (c).

In other words, sentencing courts have discretion to consider and credit time served for relevant conduct that may not be considered by the Bureau of  Prisons, under their exclusive authority under 18 U.S.C.§ 3585(b) to grant credit for time served under certain circumstances. We therefore urge this Court to consider and credit Mr. Virk for his ten months of time served at Rikers Island as reasonable punishment for the instant offense.

While it is a relief to note that Mr. Virk's  addiction is currently in remission, he has a strong need for treatment to prevent a future relapse. A sentence of additional prison time will likely expose him to the temptations of drugs within the prison walls, and prevent him from obtaining effective treatment in his community.

12

Without detracting from the gravity of his crimes, we respectfully suggest that both the specific and general deterrent purposes of a penal sanction will be satisfied by applying Mr. Virk's incarceration to his sentence. The bulk of his life lies ahead of him; and he has paid a significant debt to society over the better part of the last three years.

Finally, we anticipate that Mr. Virk, as a non-citizen, will be detained by ICE immediately upon his release and deported to Pakistan. Being deported will mean that Mr. Virk will be separated from his siblings who currently live in the United States, which is an added penalty. Further, Mr. Virk will face an additional period of confinement by ICE before his deportation is effectuated, of indeterminate length or character. To the extent it can, we thus respectfully urge the Court to consider the punitive and unpredictable nature of that post-sentence confinement and its cumulative impact upon Mr. Virk.

### *Sentences Available, Sentencing Range for Offense Category, Pertinent Sentencing Commission Policy Statements, Need to Avoid Sentence Disparities, and Need to Provide Restitution*

This Court has discretion to sentence Mr. Virk up to a maximum term of 20 years. PSR ¶ 94. His guidelines range (without adopting the suggested enhancement for the degree of injury caused) is from 87 to 108 months. Id.

To the extent it is instructive, a New York State prison sentence for robbery that causes a physical injury is a determinate sentence of between 3.5 and 15 years (42 to 180 months). New York Penal Law 160.10 (2)(a) (Robbery in the Second Degree). New York State prisoners generally serve 5/6ths of their sentence prior to release, and first time offenders who plead guilty generally receive sentences on the low end of the applicable range. It is reasonable to conclude that

13

had Mr. Virk been convicted after pleading in Kings County he would have served approximately

35 months and three weeks.

A sentence of time served (here, 35 months and a week) would avoid a sentence disparity

- and thus accords with the purpose and spirit of 18 U.S.C. § 3553(a).

Finally, Mr. Virk does not dispute the need or appropriateness of a restitution order.

## SENTENCING RECOMMENDATION

As noted above, we respectfully request a sentence of time served. This will provide for

appropriate punishment while allowing Mr. Virk the chance to maintain his recovery, remain

close to his support network of family members, and embark on a path toward becoming a suc-

cessful and contributive member of society.

## CONCLUSION

As detailed above, we believe that in this particular case, our sentencing recommendation

would provide an adequately onerous sentence that is harmonious with the needs of justice: a

sentence sufficient, but not greater than necessary.

Respectfully submitted,

/s/ *David Gray*

By: David Gray
64 Hilton Avenue
Hempstead, NY 11550
(516) 206-2002

14